## Job Iron & Steel Company v. Layne, By, et al.

(Decided May 26, 1914.)

## Appeal from Boyd Circuit Court.

1. Master and Servant—Action for Personal Injuries—Submission of Question.—In an action by servant against master for personal injuries, the evidence tending to show that at the time the servant was injured he was at a place and doing the character of work that he was accustomed to do, and that it was with the knowledge and approval of the master, the question as to whether it was the servant's duty to be at the place, and of his performance of work required of him, was properly submitted to the jury.

2. Master and Servant—Action by Servant for Personal Injuries—Safe Place to Work—Negligence.—In an action by servant against master for damages for personal injuries, evidence examined and held sufficient to take the case to the jury, and to support the finding in favor of the servant's plea that his injury was by reason of defendant's failure to furnish him a reasonably safe place in which to do the work required of him.

S. S. WILLIS, PROCTOR K. MALIN for appellant.

ZERFOSS & WEAKLEY for appellees.

OPINION OF THE COURT BY JUDGE NUNN—Affirming.

This is an appeal from a judgment awarding damages to appellee in the sum of $2,000 for personal injuries sustained by him while in the employ of appellant at its sheet steel plant in Ashland. Appellee is a boy, and at the time of the injury was sixteen years of age.

A belt had been taken off a pulley, and was hanging loose on a revolving shaft. The shaft was about 20 feet from the floor, and the lower end of the belt just about touched, or a little of it was lying on the floor. The boy was standing near, or came close to the end on the floor, and suddenly the belt got caught on, or wedged between

something on the shaft, perhaps between two pulleys, and began rapidly to wind around it. The lower end of the belt caught the boy's leg, drew him up, and wrapped him around the shaft four or five times before the machinery could be stopped. His ankle was crushed, and his leg broken in four places. It is not necessary to attempt to describe the suffering incident to such an injury. It required about the usual time under proper medical treatment for the boy to leave his bed, and he had to walk on crutches for thirteen months. The leg in healing and knitting became from two to three inches shorter than the other, and is somewhat smaller, so that he unquestionably has a very serious, and permanent deformity. If he is entitled to recover anything, the amount allowed him by the jury is not excessive; indeed appellant does not criticize the amount.

The business of appellant was the manufacture of galvanized sheet metal, and the machinery used, so far as it pertains to this case, consisted of an acid tank, a pot for holding molten zinc, and a set of chain conveyors in two series. The first section of the conveyor was about ten feet long, and the second about sixty feet long. The acid tank, the metal pot, and the conveyors were set close to each other, and in the order named. The process of galvanizing was by starting a sheet of iron through the acid tank, from which it went between iron rolls, immersed in molten zinc, contained in metal pots; from which it was carried over the first and second series of the chain conveyor, and then loaded on trucks to be carted away. The first ten foot section of the chain conveyor was rigged on a temporary structure, consisting of iron rods bolted together so that it could be easily knocked down, and moved out of the way. The purpose of this was to give easy access to the pots containing molten metal, as they had to be cleaned out every week or so. This cleaning out was called "drossing" the pots and rolls. In the run of a week certain impurities in the zinc, or "dross," as it is spoken of in the testimony, will settle at the bottom of the tanks, and collect on the rolls, and if this dross is not removed, it will very materially interfere with the process of manufacturing. This cleaning of the tank, and taking out of the rolls for drossing was done by means of a crane swung overhead, and to have free use of the crane and access to the pots, it was necessary to remove this ten foot sec-

tion of the conveyor. Appellant had two series of pots and conveyors in operation, and they were situated within about fifteen feet of each other, and parallel. Ordinarily about six employes worked with each series; that is, a man started the metal through the acid bath, another "called the drag out," took the sheet from the galvanizing tank, and started it on its trip over the conveyors, and others, including the appellee, had special bits of work to do in the process.

Appellee was called the "chain boy," and his place of work was at the far end of the conveyor where, by the use of tongs, he lifted the galvanized sheets, partly cooled by their trip on the conveyor, and loaded them onto the trucks above mentioned to be carted away, but on Saturday afternoon, or such days as it was found necessary to dross or clean out the pots, all the men at work on each series would assist. It was at such a time as this, and on a Saturday afternoon while preparing to dross the pots that the accident occurred. The first thing to do was to remove the ten foot temporary section of the chain conveyor, after taking off the drive belt, to give access to the pots, and permit the rolls to be removed. All the men on this series were standing there, and some of them were engaged in unbolting the temporary structure, and two of them had caught hold of it to pull it out of the way. The boy in stepping out of their way came in contact with the belt, and received the injuries above described.

No objection is urged to the instructions given by the court, but appellant insists that a peremptory instruction should have been given to find in its favor, and it suggests two reasons for this. First, it says that the boy at the time of his injury was at a place where his duties did not require him to be, and that he was performing work not required of him, nor within the scope of his employment. Appellant's superintendent swears that the boy's place of work was at the end of the chain conveyor, and that his duties were to remove the galvanized sheeting from the conveyor to the trucks; that he had no other duties, and that he had no business anywhere else in the plant. The boy, and nearly all the other witnesses swear that every week or so the metal pots had to be drossed, or cleaned out, that they would stop the chain conveyor, in fact, all the work incident to galvanizing the sheets through the pots would cease, and

that at such times it had always been the custom of the
chain boy to aid as a "gin-hand." By this, they mean
that it was the custom for this boy to assist the men
while they were removing the temporary conveyor struc-
ture, and when the rolls were removed to help dross
them; that as the men were taking down the temporary
structure the boy would stand near by to hand them
wrenches and tools, as they would need them, and when
the work was completed, he would gather up the tools,
and put them in their proper place.

As above indicated, the superintendent denies that
the boy had any such duty, and says that he did not know
that he ever had done any such work, but the testimony
of the other witnesses, including the boy, shows that this
had been the invariable practice, and that the superin-
tendent was usually around when this character of work
was being done, and that on this occasion he was stand-
ing between the two metal pots, or within about fifteen
feet of where the boy was injured. Since the evidence
tended to show that at the time the boy was at a place,
and doing the character of work that he was accustomed
to do, and also that it was with the knowledge and ap-
proval of the master, the court very properly submitted
the question to the jury for their determination.

The second reason urged for a peremptory instruc-
tion is the claim that if the premises were unsafe, or
dangerous by reason of this revolving belt, they were
made so by the fellow servants of appellee. We do not
understand how the men who were engaged in knocking
down this temporary structure so that the pots could be
drossed were fellow servants of the boy. Assuming that
he had duties there, they were merely to hand monkey
wrenches and tools to these men as they needed them in
loosening the bolts and the parts. These men directed
the work, and told the boy what tools they wanted, and
had him to work as they needed him. What he had to
do was to stand there, and be ready to obey their call.
This is fairly deducible from the testimony of every
witness except the superintendent of the plant. The
difficulty in the case in the way of recovery for the boy
is not the question of fellow servant, or of the insistence
that he was a volunteer, but whether the position of this
belt whereby he was injured is sufficient to prove that
the appellant was negligent in failing to provide the boy
a reasonably safe place to work. In Kentucky there is

no statutory requirement that revolving belts and gears be protected or covered, nor is it negligence per se for a master to operate belting and cog wheels without covering or guards. Negligence depends on the circumstances of each case, the nature of the service, the degree of exposure and notice thereof to the servant (26 Cyc, 1133), and it is a question of fact under the circumstances of each case for the jury to determine whether the master has exercised ordinary care to provide for the servant a reasonably safe place for the work contemplated.

At the times when they were not drossing the pots, that is, when the plant was in full operation, this belt was connected with the pulley on the line shaft above, to a pulley on this temporary conveyor section which they were removing, and in this way the conveyor was turned or driven. There was another pulley on the line shaft above, and as we gather from the evidence, close to the one first mentioned, and from it a belt was connected with the drossing pot for turning the rolls. Of course, when the conveyor structure was being knocked down, this conveyor belt was thrown off the conveyor pulley, and then of its own motion it would immediately run off the line shaft pulley above. In this way it would hang in a vertical position from, and over the line shaft, and the line shaft would turn within it, but without friction to revolve the belt, or if so, very slightly. The fact that the rolls in the molten metal were driven by a pulley on this same line shaft, and it was necessary to keep the rolls in motion, and until the very time they were taken out for drossing, explains the reason why the line shaft was not stopped. In this way it will be seen that this loose swinging belt from the revolving line shaft was not in its usual service, neither was it in motion, and for that reason no one could contend that it should have been guarded or protected. Neither can it be said that the boy, or the men working there were in any sense guilty of negligence for failing to apprehend that the belt would suddenly become caught on the line shaft, and begin to wind with it. It is true that on a nearby post there was a peg upon which the belt, under the circumstances of this case, usually hung, but if the injury was caused in the manner the evidence indicates to us, it would have in all probability happened just as it did, even if the lower end of the belt had been hung in its

accustomed place on the peg. If the pulleys on the shaft had been set further apart than the width of the belt, or if the keys or set screws wedging or fastening the pulleys on to the shaft had been properly set, there could have been nothing on the shaft to catch the belt, or wind it up.

There is evidence tending to show that there was negligence of the master in placing the pulleys too close together, considering the width of the belt, and there is no evidence to the contrary, and the accident could not have occurred from any other cause, unless it was a negligent placing of the keys, or set screws holding in place these same pulleys. If it resulted from either cause it was the negligence of the master. There was introduced in evidence a sketch or diagram of the plant showing the relative location of the conveyor pots, shafts, pulleys, switchboards, etc., and the witnesses make frequent references to it in their attempts to describe the place, and the cause of the accident. If that diagram was with the record, it would make the evidence clearer to us, and it might disturb this theory of negligence, but it is not here. Since appellant prepared the record, appellee might insist that its presence would strengthen the theory. Aside from all this, there is sufficient evidence not only to take the case to the jury, but to support their finding in favor of the boy's plea that his injury "was by reason of defendant's failure to furnish him a reasonably safe place in which to do the work required of him."

The judgment is therefore affirmed.